Citation Nr: 21050011
Decision Date: 08/13/21 Archive Date: 08/13/21

DOCKET NO. 16-36 343
DATE: August 13, 2021

ORDER

Entitlement to service connection for gastroesophageal reflux disease (GERD), to include as secondary to service-connected posttraumatic stress disorder (PTSD), is denied.

Entitlement to a rating greater than 30 percent for tension headaches is denied.

Entitlement to a rating greater than 70 percent for PTSD prior to December 31, 2014 is denied.

Entitlement to a compensable rating for hypertension is denied.

Entitlement to a compensable rating prior to December 31, 2014 and a rating greater than 10 percent thereafter for right hand arthritis is denied.

Entitlement to service connection for rhinitis is granted.

REMANDED

Entitlement to service connection for sleep apnea is remanded.

FINDINGS OF FACT

1. The Veteran's gastroesophageal reflux disease (GERD) is not secondary to service-connected posttraumatic stress disorder (PTSD) and is not otherwise related to an in-service injury or disease.

2. During the appeal period, the Veteran experienced migraines with characteristic prostrating attacks occurring on average once a month over the last several months. His migraines did not manifest in very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability.

3. Prior to December 31, 2014, the severity, frequency, and duration of the Veteran's symptoms of posttraumatic stress disorder (PTSD) did not more closely approximate total occupational and social impairment.

4. During the appeal period, the Veteran's hypertension did not manifest in diastolic pressure predominantly 100 or more, or systolic pressure predominantly 160 or more. Also, the Veteran did not both have a history of diastolic pressure predominantly 100 or more and require continuous medication for control.

5. Prior to December 31, 2014, the Veteran's right hand disability did not manifest in limitation of motion and arthritis demonstrated by x-ray in two minor joint groups; or limitation of motion with a gap of one to two inches (2.5 to 5.1 cm.) between the thumb pad and the fingers, with the thumb attempting to oppose the fingers. Thereafter, the Veteran's right hand disability manifest in limitation of motion and arthritis demonstrated by x-ray in two minor joint groups; the disability did not manifest in occasional incapacitating exacerbations, or a gap of more than two inches (5.1 cm.) between the thumb pad and the fingers, with the thumb attempting to oppose the fingers. 

6. The Veteran's diagnosed rhinitis is presumed to be due to service based on service in the Southwest Asia theater.

CONCLUSIONS OF LAW

1. The criteria for service connection for gastroesophageal reflux disease (GERD) due to service or posttraumatic stress disorder (PTSD) are not met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.310.

2. The criteria for a disability rating greater than 30 percent for migraines have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.124a, Diagnostic Code 8100.

3. The criteria for a disability rating greater than 70 percent for posttraumatic stress disorder (PTSD) prior to December 31, 2014 have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9411.

4. The criteria for a compensable rating for service-connected hypertension have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1-4.7, 4.21, 4.31, 4.104, Diagnostic Code 7101.

5. The criteria for entitlement to a compensable rating prior December 31, 2014, and a rating greater than 10 percent thereafter, for right hand arthritis have not been met. 38 U.S.C. §§ 1155, 5103(a), 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.2, 4.3, 4.7, 4.10, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5003-5228.

6. The criteria for service connection for rhinitis are met. 38 U.S.C. § 3.303; 38 C.F.R. § 3.320.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty with the Navy from June 1976 to June 1980 and active service in the Army from December 2003 to April 2005 including service in Kuwait and Iraq from March 2003 to March 2005. He also had 23 years of non active duty service.

The case is on appeal from January 2015, June 2015, July 2015, and January 2017 rating decisions.

In March 2016, the Board remanded the claims of service connection for right and left hand disability, rhinitis, GERD, and sleep apnea; remanded the claims for increased ratings for tension headaches and PTSD with TBI; and granted service connection for hypertension. 

In a January 2017 rating decision, the Agency of Original Jurisdiction (AOJ) granted service connection for right hand arthritis with a noncompensable rating effective July 18, 2007. The AOJ also granted service connection for hypertension with a noncompensable evaluation effective January 31, 2007. The Veteran appealed the rating for both conditions. 

A hearing was held before the undersigned Veterans Law Judge (VLJ) in February 2020; a transcript of the proceeding is of record.

In July 2020 the Board remanded the claims of increased ratings for tension headaches, hypertension, right hand arthritis, and PTSD; remanded the claims of entitlement to service connection for left hand arthritis, sleep apnea, GERD, and rhinitis; dismissed the claim for a 10 percent rating for multiple noncompensable disabilities; and denied the claim for an earlier effective date for service connection for headaches. 

The Veteran appealed the July 2020 Board decision denying an earlier effective date for headaches to the Court of Appeals for Veterans Claims (Court). In January 2021 the Court dismissed the appeal following the Veteran's request for withdrawal. 

In a February 2021 rating decision, the AOJ increased the Veteran's rating for PTSD with TBI to 100 percent effective December 31, 2014 and increased the rating for right hand arthritis to 10 percent effective December 31, 2014. 

In the February 2021 rating decision, the AOJ also granted service connection for left hand arthritis. The grant of service connection constitutes a full award of the benefits sought on appeal. See Grantham v. Brown, 114 F. 3d 1156, 1158 (Fed. Cir. 1997). Thus, this claim is no longer in appellate status. Id. at 1158

The Board has limited the discussion below to the relevant evidence required to support its finding of fact and conclusion of law, as well as to the specific contentions regarding the case as raised directly by the Veteran and those reasonably raised by the record. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015); Robinson v. Peake, 21 Vet. App. 545, 552 (2008).

Where there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, VA shall resolve reasonable doubt in favor of the claimant. 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518 (1996).

Service Connection

Entitlement to service connection for gastroesophageal reflux disease (GERD)

The Veteran claims that his GERD is secondary to his service-connected PTSD. 

Because the Veteran has not raised, and the record does not reasonably raise, entitlement to direct service connection, the Board's adjudication will consider only entitlement to secondary service connection.

Service connection may be granted, on a secondary basis, for disability that is proximately due to, the result of, or chronically aggravated by a service-connected condition. See 38 C.F.R. § 3.310 (a), (b); see also Allen v. Brown, 7 Vet. App. 439, 448 (1995). In order to establish entitlement to service connection on this alternative secondary basis, there must be: (1) evidence of a current disability; (2) evidence of a service-connected disability; and (3) medical evidence establishing a nexus (i.e., link) between the service-connected disability and the current disability. See Wallin v. West, 11 Vet. App. 509, 512 (1998).

The Veteran is service connected for posttraumatic stress disorder (PTSD). He was diagnosed with GERD in 2013, for which he is presently prescribed a medication for use as needed. See February 2021 VA examination. 

The Board concludes that, while the Veteran has a current disability, the preponderance of the evidence is against finding that the Veteran's GERD is proximately due to or the result of, or aggravated beyond its natural progression by service-connected PTSD. 38 U.S.C. §§ 1110, 1131; Allen v. Brown, 7 Vet. App. 439 (1995) (en banc); 38 C.F.R. § 3.310(a). 

The February 2021 VA examiner opined that the Veteran's GERD is more likely due to medication for diabetes, a condition for which the Veteran is not service connected. See March 2021 VA addendum opinion. The rationale was that, although PTSD and GERD can be co-existing comorbidities, there is no anatomical, pathophysiological, neuronal, or hormonal correlation to causation. Further, based on VA file review, there is no evidence of aggravation beyond the natural progression of the condition. Thus, the examiner opined that GERD was not at least as likely as not proximately due to or aggravated by PTSD. 

The Veteran and his representative have provided medical literature concerning the relationship between GERD and stress to include PTSD. The Board finds this evidence of limited probative value. In order to establish service connection by means of such treatise (textbook or article) evidence, it must 'not simply provide speculative generic statements not relevant to the veteran's claim.' See Wallin, 11 Vet. App. at 514. Instead, standing alone, the evidence must discuss generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least plausible causality based upon objective facts rather than on an unsubstantiated lay medical opinion. See Sacks v. West, 11 Vet. App. 314, 317 (1998). 

The Veteran believes his GERD is proximately due to or aggravated beyond its natural progression by a service-connected PTSD. The Veteran in this case is not competent to provide a nexus opinion regarding this issue. The issue is medically complex; therefore, it is outside the competence of the Veteran in this case because the record does not show that he has the skills or medical training to make such a determination. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007); see also Kahana v. Shinseki, 24. Vet. App. 428 (2011). 

The probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the physician's knowledge and skill in analyzing the data, and the medical conclusion that the physician reaches. Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). Whether a physician provides a basis for his or her medical opinion goes to the weight or credibility of the evidence in the adjudication of the merits. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998). Other factors for assessing the probative value of a medical opinion are the physician's access to the claims folder and the thoroughness and detail of the opinion. See Prejean v. West, 13 Vet. App. 444, 448-9 (2000); Nieves-Rodriguez, 22 Vet. App. 295 (2008). 

Here, the February 2021 opinion and March 2021 addendum opinion were provided by a VA medical professional who possesses the necessary education, training, and expertise to provide the requested opinions. Additionally, the opinion is shown to have been based on a review of the Veteran's record and is accompanied by a sufficient explanation as to why the Veteran's GERD is not secondary to his PTSD. Furthermore, there is no competing medical opinion of record. The Board thus finds that the February 2021 opinion and March 2021 addendum opinion are dispositive of the issue at hand.

Accordingly, as the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application, and the claim must be denied. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

Increased Rating

Disability ratings are intended to represent the average impairment of earning capacity resulting from disability. See 38 U.S.C. § 1155; 38 C.F.R. §§ 3.321(a), 4.1. Separate diagnostic codes (DCs) identify the various disabilities. See generally 38 C.F.R. Part 4. If two disability evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. Reasonable doubt regarding the degree of disability will be resolved in favor of the claimant. 38 C.F.R. § 4.3.

Consistent with the facts found, the rating may be higher or lower for periods of time under review on appeal, that is, the rating may be "staged." See Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505, 509-10 (2007).

1. Tension headaches 

The Veteran contends that he is entitled to a higher rating for his tension headaches because he experiences twice weekly headaches severe enough to preclude him from all activity. See February 2020 Board hearing testimony. The Veteran was originally granted service connection for tension headaches in a June 2015 rating decision. He is rated 30 percent effective June 18, 2013. 

Migraine headaches are rated pursuant to 38 C.F.R. § 4.124a, Diagnostic Code (DC) 8100, for migraine. Under DC 8100, a 30 percent rating is warranted for migraines with characteristic prostrating attacks occurring on an average once a month over the last several months. A 50 percent rating is warranted for migraines with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. A 50 percent rating is the highest schedular rating under DC 8100.

The rating criteria of DC 8100 are considered successive, meaning that a claimant cannot fulfill the criteria of the higher rating without fulfilling those of the next lower rating. Johnson v. Wilkie, 30 Vet. App. 245, 252 (2018). This renders 38 C.F.R. §§ 4.7 and 4.21 inapplicable. Id. at 252.

The phrase "characteristic prostrating attacks" is used in the criteria corresponding to 10 percent and 30 percent ratings under DC 8100 to describe the nature and severity of migraines, but it is not defined in the regulation. Dorland's Illustrated Medical Dictionary 1531 (32d ed. 2012), defines prostration as "extreme exhaustion or powerlessness." Thus, the phrase "characteristic prostrating attacks" is understood to describe migraine attacks that typically produce extreme exhaustion or powerlessness.

The rating criteria for a 50 percent rating contain several undefined phrases. The descriptive phrase "very frequent" connotes a frequency at least greater than once a month, as is required by the rating criteria corresponding to a lesser 30 percent rating. Johnson, 30 Vet. App. at 253. The phrase "completely prostrating" generally means that the migraines attack must render the veteran entirely powerless. Id. The completely prostrating attacks must also be "prolonged," which is defined as "to lengthen in time: extend duration: draw out: continue, protract." Id. Lastly, the 50 percent rating criteria requires that the very frequent completely prostrating and prolonged attacks be "productive of severe economic inadaptability." Productive can be read as having either the meaning of "producing" or "capable of producing," and, with regard to severe economic inadaptability, nothing in DC 8100 requires that the claimant be completely unable to work in order to qualify for a 50 percent rating. Pierce v. Principi, 18 Vet. App. 440, 445-46 (2004).

The Board concludes that the Veteran has had tension headaches with characteristic prostrating attacks occurring on average once a month over the last several months throughout the appeal period, corresponding to the criteria for a 30 percent rating under DC 8100. 

At the April 2015 VA examination, the Veteran described his headaches as pressure-like pain on the top of his head, occurring about three days per week and lasting about 30 to 60 minutes. His symptoms were constant head pain on both sides of head, nausea, sensitivity to sound, and lightheaded dizziness. The examiner noted that he has characteristic prostrating attacks once per month, and that his headaches would cause him to have intermittent absences, tardiness, or to go home from work early.

In December 2015 VA treatment records the Veteran reported headaches three times a week with variable control with medication. He was prescribed amitriptyline in addition to his current medication, Fioricet. 

From 2017 to 2020 the Veteran reported several headaches every week severe enough to impact his ability to participate in activities. See, e.g., VA treatment records dated May 2017, October 2018, August 2019, and March 2020. He reported an increase in the severity and frequency of his headaches in January 2019 and January 2020, and in February 2020 he reported headaches upon waking. 

At the February 2021 VA examination the Veteran reported taking Tylenol as needed for headaches. He described pain on both sides of his head without any non-headache symptoms like nausea or vomiting. His headaches last less than one day. The examiner noted that he does not have characteristic prostrating attacks. However, the examiner noted that his headaches cause low physical and mental performance at work during an active headache. 

The Veteran is competent to report his readily observable symptoms. Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). However, the Board finds his statements regarding the severity and frequency of his headaches are partially credible. While the April 2015 VA examiner indicated characteristic prostrating attacks once per month, and the Veteran testified at the February 2020 hearing that he experiences twice weekly debilitating headaches, VA treatment records and VA examinations reflect headaches that, while severe and produce some limiting effects, do not render him extremely exhausted or powerless. Moreover, though the Veteran reports a mild impact on his work, he has been able to maintain employment over the appellate period and does not report regularly missing work due to headaches. The April 2015 VA examination, which identified once monthly prostrating attacks, noted only that his headaches cause intermittent absences, tardiness, or early departures from work. Moreover, the February 2021 VA examination found no evidence for prostrating attacks, and only a mild impact on his work. 

In summary, the Board finds that the preponderance of the evidence is against a finding that the Veteran has very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. Accordingly, a 50 percent rating under DC 8100 is not warranted. 

2. Posttraumatic stress disorder (PTSD) 

The Veteran contends he is entitled to an increased rating for his PTSD. 

The Veteran was initially granted service connection for PTSD in a March 2012 rating decision, with a 10 percent rating effective December 10, 2009, and a 30 percent rating effective March 10, 2012. In an October 2012 rating decision his rating was increased to 70 percent effective August 16, 2012. 

In December 2014 the Veteran submitted an intent to file. A June 2015 rating decision continued his 70 percent rating for PTSD but combined it with his rating for TBI. The instant appeal stems from this rating decision. In February 2021 the Veteran's rating was increased to 100 percent, effective December 30, 2014, the date of his intent to file. 

At the time of the February 2020 Board hearing, the Veteran's rating was 70 percent. At the hearing, his representative contended that the Veteran's rating should be 70 percent or higher, and that such a rating should relate to the earliest effective date available for TBI and headaches as those conditions are related to PTSD. As above, the Veteran's rating is now 100 percent, effective December 31, 2014.

For the reasons that follow, the Board finds that the preponderance of the evidence is against a finding that the Veteran's PTSD warrants a rating greater than 70 percent rating prior to December 31, 2014. The Board need not address the period after December 31, 2014 as the Veteran is rated 100 percent thereafter. 

The Veteran's representative essentially argues that, because headaches, TBI, and PTSD are part and parcel of the same condition, the earliest claim on file pertaining to any of the three conditions should be construed as a claim for all three conditions, and thus the effective dates should be the same. Thus, to address the representative's argument, a brief procedural history of all three conditions is required. 

As above, an October 2012 rating decision increasing his rating for PTSD to 70 percent effective August 16, 2012. The Veteran did not perfect a substantive appeal or submit new and material evidence within one year of the October 2012 rating decision. Accordingly, that rating decision is final. 38 U.S.C. §§ 5108, 7105. 

The Veteran was also granted service connection for TBI in a July 2013 rating decision, effective April 17, 2009. The Veteran did not perfect a substantive appeal or submit new and material evidence within one year of this decision. Accordingly, this rating decision is also final. 38 U.S.C. §§ 5108, 7105.

On December 31, 2014, the Veteran submitted an intent to file, which was followed by a formal claim in January 2015 for an increased rating for PTSD and TBI. A June 2015 rating decision continued the 70 percent rating but merged the rating for TBI under PTSD. In this rating decision, the RO also granted service connection for tension headaches with a 30 percent disability rating effective June 18, 2013, the date the office received the Veteran's informal claim for service connection for headaches. The instant appeal stems from this rating decision. 

In July 2020 the Board remanded the claim for an increased rating for PTSD based on the Veteran's assertions that his condition worsened. The Board also denied the claim for an earlier effective date for headaches, finding that the Veteran did not file a formal or informal claim for service connection for headaches prior to his June 2013 informal claim, and that the Veteran's headache disability was separate from the disability types previously service connected, i.e., TBI and PTSD. 

In a February 2021 rating decision, the AOJ increased the Veteran's rating for PTSD to 100 percent effective December 31, 2014, the date the AOJ receive the Veteran's intent to file.

Generally, the effective date of an award of disability compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase is the date of receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C. § 5110; 38 C.F.R. § 3.400. However, the effective date for an increased rating claim may date back as much as one year before the date of the claim for increase if it is factually "ascertainable that an increase in disability had occurred" within that timeframe. See 38 U.S.C. § 5110 (b)(2). 

As above, the Veteran's representative argues that, because headaches, TBI, and PTSD are part and parcel of the same condition, the earliest claim on file pertaining to any of the three conditions should be construed as a claim for all three conditions, and thus the effective dates should be the same. However, as above, the issue of an earlier effective date for service connection for headaches has been finally adjudicated. The Board has already determined that the earliest claim for headaches is June 2013, and that headaches are separate from PTSD with TBI. Further, the October 2012 and July 2013 rating decisions granting service connection for PTSD and TBI, respectively, are final, and there is no evidence that the Veteran sought an increased rating for his PTSD with TBI on a formal or informal basis before December 2014. 

It is a well-established legal principle that there can be no freestanding claim for an earlier effective date because to allow such a claim would be contrary to the principle of finality set forth in 38 U.S.C. § 7105. See Rudd v. Nicholson, 20 Vet. App. 296 (2006). Only a request for revision based on clear and unmistakable error could result in the assignment of an effective date earlier than the date of a final decision, as freestanding claims for earlier effective dates vitiate the rule of finality. Id. No such assertions have been raised by the Veteran or his representative. As there have been no contentions regarding CUE in the previous decisions, the Veteran's effective date cannot relate to any claims other than the increased rating claim on appeal, filed in December 2014. See, Rudd, supra. 

In increased rating claims, the Board looks at the evidence in the year prior to the claim to see the earliest date that it is factually ascertainable that an increase occurred. 38 C.F.R. § 3.400. Accordingly, the earliest possible effective date for an increased rating for PTSD is December 31, 2013 (one year prior to the date of the claim on appeal). Thus, the issue in this appeal is whether, between December 31, 2013 to December 31, 2014, it is factually ascertainable that an increase occurred such that the Veteran's associated symptoms caused the level of impairment required for a disability rating of 100 percent.

Turning now to the relevant rating criteria, the Veteran's PTSD is evaluated under DC 9411 under the General Formula for Mental Disorders (General Formula). Under the General Formula, the Board must conduct a "holistic analysis" that considers all associated symptoms, regardless of whether they are listed as criteria. Bankhead v. Shulkin, 29 Vet. App. 10, 22 (2017); 38 C.F.R. § 4.130. The Board must determine whether unlisted symptoms are similar in severity, frequency, and duration to the listed symptoms associated with specific disability percentages. Then, the Board must determine whether the associated symptoms, both listed and unlisted, caused the level of impairment required for a higher disability rating. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 114-118 (Fed. Cir. 2013). 

The Board concludes that, in the year prior to the Veteran's December 2014 intent to file, it is not factually ascertainable that an increase occurred in the Veteran's PTSD symptoms to cause the level of impairment required for a disability rating of 100 percent. The Veteran's symptoms more closely approximated the symptoms associated with a 70 percent rating and resulted in a level of impairment that most closely approximated the level of impairment associated with a 70 percent rating. 

A 70 percent rating is assigned when symptoms such as suicidal ideation; obsessional rituals which interfere with routine activities; intermittently illogical, obscure, or irrelevant speech; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); or inability to establish and maintain effective relationships cause occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.

A 100 percent rating is assigned for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; or memory loss for names of close relatives, own occupation or own name.

VA treatment records from December 2013 to December 2014 show the Veteran regularly attended mental health support groups and therapy sessions and was compliant with his medications. The Veteran's symptoms and medication regimen were stable. For example, in April 2014 the Veteran reported being able to get out when he needs to and working full-time, though he missed work two to three days per month due to anxiety symptoms. His PTSD was noted to be stable with appropriate treatment. See also November 2014 VA treatment records. In March 2015, his mood and affect were euthymic with noted improvements in his mood and concentration with the use of a CPAP machine for sleep apnea. He denied suicidal or homicidal ideation. 

In summary, within the year prior to his December 2014 intent to file, the Veteran did not report, and the record does not show, an increase in his symptoms and functional impairment consistent with the 100 percent rating criteria. VA treatment records show that the Veteran's PTSD was manifested by symptoms associated with a 70 percent rating (difficulty in adapting to stressful circumstances, inability to establish and maintain effective relationships, and near continuous depression affecting the ability to function independently, appropriately and effectively). He also experienced chronic sleep disturbance, a symptom that is listed with the 30 percent rating criteria. 

The Board also finds the level of impairment caused by the Veteran's symptoms more closely approximates the level associated with a 70 percent rating. The Veteran experienced occupational and social impairment with reduced reliability and productivity with deficiencies in most areas. As above, the Veteran reported missing two to three days of work per month due to symptoms. He also reported poor relationships outside of his immediate family. 

In short, the preponderance of the evidence weighs against finding that the severity, frequency, and duration of the Veteran's symptoms increased within the year prior to the December 2014 claim such that his symptoms resulted in the level of impairment required for a 100 percent rating. The criteria for a 100 percent or higher rating prior to December 31, 2014 are not met and the appeal must be denied.

3. Hypertension

The Veteran contends that he is entitled to a higher rating for hypertension because his diastolic blood pressure is often over 100. The Veteran was originally granted service connection in a January 2017 rating decision with a noncompensable rating effective January 31, 2007.

Hypertension is rated pursuant to 38 C.F.R. § 4.104, Diagnostic Code (DC) 7101, for hypertensive vascular disease (hypertension and isolated systolic hypertension). Under DC 7101, a 10 percent rating is warranted for diastolic pressure predominantly 100 or more, or; systolic pressure predominantly 160 or more, or; it is the minimum evaluation for an individual with a history of diastolic pressure predominantly 100 or more who requires continuous medication for control.

The term "predominant" is not defined in the rating criteria. Merriam-Webster defines predominant to mean "being most frequent or common." See, e.g., "predominant," Merriam-Webster.com Online Dictionary, https://www.merriam-webster.com/dictionary/predominant.

For the reasons that follow, the Board finds that the Veteran's hypertension has not more nearly approximated the criteria corresponding to a 10 percent rating.

STRs show blood pressure as 159/94 in January 2004 and 182/100 in March 2004. 

VA treatment records contain no blood pressure readings prior to 2009. VA treatment records from 2009 onward reveal systolic blood pressure predominantly less than 160 and diastolic blood pressure predominantly less than 100. The Veteran has also been continuously prescribed medication to control his blood pressure, with several alterations in his regimen throughout the appellate period. 

In 2009 the Veteran's systolic blood pressure readings were all below 160, and his diastolic readings were all below 110. In that year, the highest readings were 151/108 and 174/100. See July 2009 VA treatment records. However, in March 2009 his blood pressure was 119/77, with a similar reading in May 2009. 

In 2010 and 2011 the Veteran's systolic blood pressure readings were all below 160, and his diastolic readings were all below 100. The highest readings were 144/80 in June 2010 and 134/90 in January 2011. His physicians indicated his hypertension was well controlled with medication. See May 2010 and April 2011 VA treatment records. 

In 2012 and 2013 the Veteran's systolic blood pressure readings were all below 160, and his diastolic readings were all below 110. In May 2012 his blood pressure was at its highest that year, measured as 170/100 and 150/106, but subsequent blood pressure readings were lower with the highest measurements recorded as 155/80 and 149/83 in June 2012. It was noted in June 2012 that he was not taking his blood pressure medication as prescribed. At the January 2013 VA examination blood pressure readings were 164/106, 141/96, and 141/102. The examiner noted that the Veteran does not have a history of diastolic blood pressure elevation to predominantly 100 or more. Systolic blood pressure readings later in 2013 were all below 160, and diastolic blood pressure readings were all below 100. See, e.g., October 2013 VA treatment records.

From 2014 to 2017 the Veteran's systolic blood pressure readings were all below 160, and his diastolic readings were all below 100. In January 2014 and September 2017 his physician indicated good control on medication. His highest blood pressure readings during this period were 152/94 in July 2014 and 154/91 in November 2014. 

In March 2018 the Veteran's blood pressure was 127/87, and in October 2019 it was 172/105 and 178/95. His medication was changed, and by January 2020 his physician noted that his blood pressure had improved, but there was no measurement included in the office visit notes. In June 2020 his blood pressure was recorded as 154/95, and in July 2020 it was noted that he was checking his blood pressure at home, with readings about 138/85 "or so." His medication was increased in July 2020. 

At the February 2021 VA examination, the Veteran's blood pressure was 140/80, 142/80, and 140/76. The examiner noted that there was no history of diastolic blood pressure elevation to predominantly 100 or more, and no impact on his work. The Veteran reported good control with his current medication. 

Thus, throughout the appellate period, while there have been some diastolic blood pressure readings of 100 or more and systolic pressure readings of 160 or more, those are not the predominant readings. The Veteran's diastolic blood pressure has predominantly been below 100, and his systolic blood pressure has predominantly been below 160. Additionally, though there have been some changes in his medication regimen throughout, his blood pressure has responded to the changes and the Veteran has reported adequate control. Moreover, the January 2013 and February 2021 VA examiners both noted there was no history of diastolic pressure elevation predominantly 100 or more. 

The Board has considered the Veteran's testimony that his diastolic readings are often over 100 at home. However, as above, this is inconsistent with the blood pressure readings recorded in the medical records. Thus, the Board finds the Veteran's statements regarding his diastolic blood pressure readings to be not credible. See Jandreau, supra. 

Accordingly, the Board finds that the Veteran's hypertension does not manifest in diastolic pressure predominantly 100 or more, or systolic pressure predominantly 160 or more. Also, though the Veteran required continuous medication for control, he does not have a history of diastolic pressure predominantly 100 or. There is no reasonable doubt to be resolved. The Veteran's hypertension does not more nearly approximate the criteria corresponding to a 10 percent rating. Consequently, the appeal must be denied. 

4. Right hand arthritis 

The Veteran contends that his right hand disability warrants an initial compensable rating prior to December 31, 2014, and a rating greater than 10 percent thereafter. A January 2017 rating decision granted service-connection for right hand arthritis with an initial noncompensable rating effective July 18, 2007. A February 2021 rating decision increased the Veteran's rating to 10 percent effective December 31, 2014. 

For the reasons that follow, the Board finds that the preponderance of the evidence is against a compensable rating prior to December 31, 2014, and a rating greater than 10 percent thereafter. 

The Veteran's right hand arthritis is currently evaluated under DC 5003-5229. Hyphenated diagnostic codes are used when a rating under one diagnostic code requires use of an additional diagnostic code to identify the basis for the evaluation assigned; the additional code is shown after the hyphen. See 38 C.F.R. § 4.27. The hyphenated diagnostic code in this case indicates that degenerative arthritis, under DC 5003, was the service-connected right hand disability, while the residual condition is limitation of motion of the index finger, which is evaluated under 38 C.F.R. § 4.71a, DC 5229. However, the evidence reveals an impairment of the right thumb only. Limited motion of the thumb is evaluated under DC 5228. Thus, the appropriate rating criteria are found under DC 5228. 

The Board notes that during the pendency of the Veteran's appeal, VA amended the criteria for rating musculoskeletal disabilities. The new regulation applies to claims received on or after February 7, 2021 or previously filed claims that are pending on February 7, 2021 if the new regulation will render more favorable result for the Veteran. However, as the amendments did not change the substantive rating criteria under DC 5003 or 5228, an evaluation of the pre- and post-amendment rating criteria is not necessary. 

The rating criteria provides that under DC 5003, degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate DCs for the specific joint or joints involved. When, however, the limitation of motion of the specific joint or joints involved does not warrant a compensable rating under the appropriate DCs, a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under DC 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. See 38 C.F.R. § 4.71a. In the absence of limitation of motion, a 10 percent rating is warranted where there is X-ray evidence of involvement of two or more major joints or two or more minor joint groups. A 20 percent rating is warranted where there is X-ray evidence of involvement of two or more major joints or two or more minor joint groups, with occasional incapacitating exacerbations. Notes (1) and (2) in DC 5003 indicate these 10 and 20 percent ratings based on X-ray findings will not be combined with ratings based on limitation of motion. See 38 C.F.R. § 4.71a, DC 5003.

Multiple involvements of the interphalangeal, metacarpal, and carpal joints of the upper extremity are considered a group of minor joints. 38 C.F.R. § 4.45(f).

Under DC 5228, a noncompensable rating is warranted for limitation of motion of the thumb with a gap of less than one inch (2.5 cm) between the thumb pad and the fingers, with the thumb attempting to oppose the finger. A 10 percent rating is warranted for limitation of motion of the thumb, with a gap of one to two inches (2.5 to 5.1 cm) between the thumb pad and the fingers, with the thumb attempting to oppose the fingers. A maximum 20 percent rating is warranted for limitation of motion of the thumb with a gap of more than two inches (5.1 cm) between the thumb pad and the fingers, with the thumb attempting to oppose the fingers. See 38 C.F.R. § 4.71a, DC 5228. In determining disability ratings, DC 5228 makes no differentiation between the major and minor hands.

VA treatment records reflect reports of right hand pain throughout the appellate period. See, e.g., March 2009, May 2011, and October 2017 VA treatment records. A March 16, 2009 X-ray revealed moderate degenerative changes in the carpal metacarpal (CMC) joint and remodeling of the metacarpal shaft of the right thumb. In May 2011 the Veteran reported pain in the right thumb with activity. Range of motion was normal, but fine manipulation, grip, and pinch strength were decreased on the right compared to the left. He was given a splint for his thumb. The Veteran received occupational therapy in late 2017 due to increased pain in the base of his bilateral thumbs. An X-ray showed some osteoarthritic changes at the CMC joint of the right thumb manifested by joint space narrowing and some mild evidence of spurring. Subsequent VA treatment records show continued reports of pain, swelling, and stiffness in the hands. See, e.g., August 2019 and January 2021 VA treatment records. 

The Veteran was afforded VA examinations in January 2013, January 2014, December 2016, and February 2021. The Veteran's reports of additional pain after prolonged use were consistent across all examinations. All examinations found no ankylosis or gap between the thumb and fingers. The January 2014 VA examination indicated pain on movement after repetitive use but did not indicate whether that pain caused loss of range of motion. The December 2016 VA examination is the first examination that provided measurements indicating limitation of motion of the thumb, where the examiner found that, during flare-ups, flexion in the metacarpophalangeal (MCP) joint was to 50 degrees and flexion in the interphalangeal (IP) joint was to 60 degrees. Grip strength on the right was reduced to 4/5 at the January 2014 and December 2016 examinations. 

In summary, the preponderance of the evidence is against a finding that, prior to December 31, 2014, the Veteran's right hand disability warrants a compensable rating. Prior to this date, the disability is manifest by pain after repetitive use without x-ray evidence of involvement of two minor joint groups of the right hand. The March 2009 x-ray showed only involvement of the CMP joint. There is no evidence of involvement of more than one joint of the hand until the December 2016 VA examination's finding of limited range of motion in the MCP and IP joints. Further, throughout the appellate period, there is no gap between the thumb pad and the fingers, with the thumb attempting to oppose the finger, even during flare-ups or after repetitive use over time. There is also no evidence of occasional incapacitating exacerbations. Thus, a compensable rating prior to December 14, 2014, and a higher rating of 20 percent thereafter, under DC 5003-5288 or DC 5288 is not warranted.

The Board has also considered whether any other diagnostic codes would permit a higher rating at any point for the right thumb disability. However, ankylosis, whether favorable or unfavorable, of any digits of the right hand is not demonstrated by the evidence (DCs 5216 - 5227). 38 C.F.R. § 4.71a.

In summary, the Board finds the preponderance of the evidence is against a compensable rating prior to December 31, 2014, against a rating greater than 10 percent thereafter. 

5. Service connection for rhinitis

Subsequent to remand, a new relevant regulation became effective. Under 38 C.F.R. § 3.320, the Veteran is presumed to have been exposed to particulate matter based on his service in Southwest Asia. The record is at least in relative equipoise as to whether the diagnosed rhinitis manifested within 10 years of this service. On this basis, service connection is warranted.

REASONS FOR REMAND

1. Entitlement to service connection for sleep apnea is remanded.

The Veteran claims that he has sleep apnea as a result of military service to include secondary to his service-connected PTSD. This claim was previously remanded to obtain a VA examination and opinion regarding the etiology of his sleep apnea. 

A January 2016 letter from Ms. E.B., ANP in sleep medicine indicated that the Veteran reported possible indications of sleep apnea onset in the military or shortly thereafter, including snoring in the military, and excessive daytime sleepiness starting in approximately 2005. The Veteran also submitted two lay statements from family members reporting possible symptoms of sleep apnea as early as 2005, and proof of a work-related accident in 2009 due to fatigue. See February 2015 Third Party Correspondence. 

The February 2021 VA examiner opined against relation to service based on the lack of evidence of sleep apnea or signs or symptoms thereof in service, and his diagnosis 10 years after service. However, this opinion is inadequate as the examiner did not consider the evidence noted above. Accordingly, an addendum opinion is required to consider the lay evidence of symptoms in and since service. 

The matters are REMANDED for the following action:

1. Obtain updated VA treatment records.

2. Thereafter, obtain an addendum opinion from an appropriate clinician regarding whether the Veteran's sleep apnea is at least as likely as not related to related to service, including snoring in service. 

The examiner's attention is drawn to the following evidence: 

January 2015 lay statement from D.E. that, while on leave from Iraq in April 2005, she witnessed the Veteran fall asleep watching TV in early evening, snoring, and waking up gasping for breath.

December 2015 lay statement from R.M. that after the Veteran's return from Iraq in 2005, she observed trouble falling asleep, waking up breathless, snoring, daytime sleepiness, and trouble focusing. 

January 2016 letter from Ms. E.B., ANP indicating that snoring in service and reports of fatigue after service may have indicated sleep apnea's onset in service. 

The Veteran's competent and credible statements that he was in a work-related accident in early 2009 due to fatigue. 

In providing the requested opinion, consider the Veteran's description of his in-service injury and symptoms as well as his post-service symptoms. If there is any medical reason to accept or reject the proposition that the Veteran's reported injury and symptoms in service and thereafter represented the onset of his current disability, this should be noted. Stated another way, do the Veteran's reports about his symptoms align with how the currently diagnosed disability is known to develop or are the Veteran's reports generally inconsistent with medical knowledge or implausible?

 

The examiner must provide a complete explanation for all opinions. 

 

 

Nathaniel J. Doan

Veterans Law Judge

Board of Veterans' Appeals

Attorney for the Board K.L. Blevins, Associate Counsel

The Board's decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.